UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

JOSE DANIEL VALADEZ, III,

          Plaintiff,

v.                                  No. SA-21-CV-0002-JKP

CITY OF SAN ANTONIO,

          Defendant.

## MEMORANDUM OPINION AND ORDER

The Court has under consideration *Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction* (ECF No. 7). Defendant, City of San Antonio ("the City"), has filed a response (ECF No. 11), a Notice Regarding Policy Change (ECF No. 13), and a Reply to Plaintiff's Response to Notice (ECF No. 15). Plaintiff has filed a reply brief (ECF No. 12), a Response to Defendant's Notice Regarding Policy Change (ECF No. 14), and a Notice Concerning Street Performing in Downtown San Antonio (ECF No. 16). The Court, having fully considered the complaint, motion, briefing, and all matters of record, finds no need to conduct a hearing and hereby **DENIES** the motion.

## I. BACKGROUND[1]

For eleven years, Plaintiff has been a local street performer who generally performs a comedic breakdancing show on the weekends at public outdoor spaces in downtown San Antonio. *See* Verified Compl. (ECF No. 1) ¶ 10. He "uses a speaker, microphone, and music in the performance of his artistic expression." *Id*. In his complaint, he has provided a link to an online video example of his routine. *Id*. at 4 n.1.

---

[1] The facts are essentially uncontested.

As shown by Exhibit A to Plaintiff's complaint, the City of San Antonio updated a Downtown Street Performers Policy ("DSPP" or "the Policy") on December 7, 2017. *See* ECF No. 1-1. After a brief introduction (¶ 1), the DSPP sets out its purpose (¶ 2), defines relevant terms (¶ 3), designates permitted areas (¶ 4), eliminates any registration requirement (¶ 5), and identifies various restrictions (¶ 6). *See id.* Its introduction recognizes that "Street Performing, also known as busking, provides a public amenity that enhances the vibrancy and ambience of Downtown San Antonio" and the City "encourages the performance of non-commercial artistic expression at downtown sidewalks, plazas and parks." *Id.* ¶ 1. The stated purpose is to "establish[] guidelines for what is allowed with busking in Downtown San Antonio" and to make the guidelines inapplicable to "any other program authorized by the City of San Antonio." *Id.* ¶ 2.

For purposes of the DSPP, "'City' means the City of San Antonio" and "'Downtown' means the Central Business District." *See id.* ¶¶ 3.1 and 3.2. The DSPP defines "Street performance" or "busking" as "the practice of performing in designated areas, for voluntary donations" while noting that "Busking includes non-amplified musical performances and other types of personal entertainment." *Id.* ¶ 3.3. It defines "Street Performer" as "the person presenting an artistic expression in the form of music, dance, acrobatic, comedy, singing, musical performance or other expressive activities." *Id.* ¶ 3.4. In general, the DSPP permits busking in downtown public areas controlled by the City except for the River Walk, Alamo Plaza, Main Plaza, and outdoor places owned and controlled by the City for other purposes. *Id.* ¶ 4.1. It designates "Travis Park" and "specific areas of Houston Street and certain cross streets along Houston Street" as "[p]referred locations." *Id.* ¶ 4.2.

The City does not require performers to register. *See id.* ¶ 5. But it does set out restrictions on tips and donations (¶ 6.1), public solicitation (¶ 6.2), aggressive panhandling (¶ 6.3), selling

merchandise (¶ 6.4), noise (¶ 6.5),[2] connecting to City power sources (¶ 6.6), performance hours (¶ 6.7), and performing during private or community events. Paragraph 6.5 expressly requires Street Performers to "fully comply with noise regulations" and, prior to its 2021 modification, disallowed "amplification of any kind." Stated in full, ¶ 6.1 provides:

> Street Performer may solicit tips and donations from the public solely by means of a small sign no larger than 24 inches x 38 inches with a receptacle (such as a musical instrument case or small box); at no time shall the Street Performer make an oral solicitation while street performing or violate any of the City's regulations regarding public solicitation.

Plaintiff contends that he has been expelled from various downtown locations since 2017 because he is a street performer and San Antonio's policy targets street performers. *See* Verified Compl. ¶ 11; Mot. at 3. According to Plaintiff, he was arrested in 2017 following enforcement of the Policy and "seized" in early January 2021. *See* Verified Compl. ¶ 12. On December 12, 2020, he was detained and cited for noise nuisance, at Travis Park, a place designated as a preferred location for street performers. *See id.* ¶ 27.

After his attorney informally notified the City of his intent to pursue this action, the parties entered into a temporary agreement on December 22, 2020, *see id.* ¶ 30, which is attached to Plaintiff's complaint as Exhibit D, *see* ECF No. 1-4. That exhibit memorializes the agreement and states:

> Until the earlier of (a) January 22, 2021, or (b) the date of an order granting or denying relief on a motion for temporary injunction or other emergency relief in a civil action in which Jose Daniel Valadez, III and the City of San Antonio are parties:
>
> The City will not arrest, relocate or require Valadez to stop performing outdoors in the Permitted Areas of the Central Business District for the reason that Valadez is

---

[2] On January 11, 2021, the City updated the DSPP to remove the following sentence from ¶ 6.5: "No amplification of any kind is allowed." *See* Exhibit (ECF No. 13-1) attached to the City's Notice (ECF No. 13). Other than that omission, the 2021 and 2017 versions are identical. Plaintiff contends that "[s]imply removing one line about amplification from a policy imposing a complete ban of street performers does not change anything." *See* ECF No. 14. The City disagrees and submits that the changed policy limits Plaintiff's challenge to an attack on location restrictions. *See* ECF No. 15.

using amplification. Notwithstanding, the City is free to enforce – including against Valadez – the City's noise regulations (in secs. 21-51 to 21-61 of Municipal Code and wherever else they may be found) and all other applicable laws and ordinances.

The Permitted Areas include all sidewalks, plazas and parks in the Central Business District. Permitted Areas do not include any of the places identified in 4.1 of the [DSPP] or other City properties that are not traditionally open to the public for expressive purposes (e.g., employee workplaces, parking garages, etc.).

This agreement modifies secs. 4.1 and 6.5 of the [DSPP] but leaves the balance of the policy intact.

*See id.*

During the weekends of December 25, 2020, and January 1, 2021, Plaintiff engaged in busking in downtown San Antonio. *See* Verified Compl. ¶ 31. While at Alamo Plaza, Plaintiff was threatened with citation and arrest each day he performed there. *Id*. He contends that he was harassed by San Antonio Police Officers on January 3, 2021, even though he was in full compliance with all pertinent ordinances. Mot at 3.

Plaintiff commenced this action by filing his verified complaint on January 4, 2021. He sues the City under 42 U.S.C. § 1983 for violating his procedural and substantive due process rights under the Fourteenth Amendment (Count I); violating his First Amendment rights (Count II); retaliation in violation of the First Amendment (Count III); violating his Fourth Amendment right to be free from unreasonable seizure (Count IV); and violating his right to equal protection (Count V). *See* Verified Compl. ¶¶ 34-67. He seeks declaratory and injunctive relief. *See id.* ¶¶ 68-81. He specifically "seeks to stop the ban of street performers from all outdoor public locations if street performers are not in violation of any other ordinance, law, or regulation." *Id*. ¶ 74. In addition, he "seeks to enjoin enforcement of the City's Policy banning all street performances with any amplification if the performance is otherwise not in violation of any other ordinance, law, or regulation." *Id*.

Although the complaint primarily concerns the Policy's amplification restriction, it also

challenges its location-based restrictions. As to the challenged Policy, the complaint provides no indication of any other constitutional challenge. Plaintiff describes the Policy in general as "overly broad, vague, and unconstitutional." *Id*. ¶ 25. He further states that the "Policy of banning street performers from most public locations downtown without amplification, and all locations downtown if there is any amplification, is unconstitutionally overbroad and vague." *Id*. ¶ 49. He alleges that the Policy is both "facially unconstitutional and as applied to him. *Id*. ¶ 71. In his prayer for relief, he seeks compensatory and punitive damages. *See id.* at 22.

Through his motion for temporary restraining order ("TRO") and preliminary injunction, Plaintiff seeks to immediately enjoin the City from enforcing the DSPP, specifically those provisions that are inconsistent with local ordinance and that ban Plaintiff from performing in the public square that is open to the public at large for expressive purposes. Mot. at 2. Even more specifically, he seeks to enjoin the City from enforcing the location restrictions set out in ¶ 4.1 and "everything" in ¶ 6.5 following "Street Performers must fully comply with noise regulations." *Id*. at 19. He contends that the Policy serves no legitimate governmental interest, targets street performers, and infringes on their First Amendment right of speech and expression. *Id*. at 2. Although it is apparent that his primary claim arises under the First Amendment, he argues that enforcement of the Policy also violates his rights under the Fourth and Fourteenth Amendments. *Id*.

Finding no adequate reason to proceed without providing Defendant an opportunity to respond, the Court set a briefing schedule for the motion. *See* Order Setting Briefing Schedule (ECF No. 10). Having now received a response from Defendant and a reply brief from Plaintiff, the Court is prepared to rule. The Court will also address the City's recent change to its policy to the extent the change impacts the pending motion.

## II. APPLICABLE LAW

The Federal Rules of Civil Procedure specifically govern preliminary injunctions and temporary restraining orders. *See* Fed. R. Civ. P. 65. The primary difference between the two is whether "all interested parties had an opportunity to participate, thus allowing for full presentation of relevant facts" and this difference affects the appealability of the resulting order. *Belo Broad. Corp. v. Clark*, 654 F.2d 423, 426 (5th Cir. Unit A 1981). While Fed. R. Civ. P. 65(b)(1) permits courts to issue a TRO without notice to adverse parties in specified circumstances, Rule 65(a)(1) precludes issuance of a preliminary injunction without notice to such parties.

"The purpose of a preliminary injunction [(or TRO)] is merely to preserve the relative positions of the parties until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). To obtain a preliminary injunction or TRO, the movant must demonstrate the following equitable factors: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) the grant of the injunction will not disserve the public interest." *Janvey v. Alguire*, 647 F.3d 585, 595 (5th Cir. 2011) (citing *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir. 2009)); *accord Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 452 (5th Cir. 2014). Stated differently, a movant "seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). And for purposes of issuing a preliminary injunction, the irreparable injury must occur "during the pendency of the litigation." *Justin Indus., Inc. v. Choctaw Secs., L.P.,* 920 F.2d 262, 268 n.7 (5th Cir. 1990).

"A preliminary injunction is an extraordinary remedy and should only be granted if the [movant has] clearly carried the burden of persuasion on all four requirements." *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008) (internal quotation marks omitted). Granting such "injunction is to be treated as the exception rather than the rule." *Healthpoint, Ltd. v. Stratus Pharm., Inc.*, 273 F. Supp. 2d 769, 777 (W.D. Tex. 2001). Courts do not award such an extraordinary remedy "as of right." *Winter*, 555 U.S. at 24. Each case requires the courts to "balance the competing claims of injury and . . . consider the effect on each party of the granting or withholding of the requested relief." *Id.* (citation omitted). Whether to grant or deny a preliminary injunction lies within the sound discretion of the district courts. *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 320 (1982). And when, "exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted).

Given the limited purpose served by a preliminary injunction and "the haste that is often necessary if those positions are to be preserved, a preliminary injunction is customarily granted on the basis of procedures that are less formal and evidence that is less complete than in a trial on the merits." *Univ. of Tex.*, 451 U.S. at 395. Accordingly, a movant "is not required to prove his [or her] case in full at a preliminary-injunction hearing." *Id*. To show a substantial likelihood of success on the merits, a movant "must present a prima facie case, but need not prove [entitlement] to summary judgment." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013).

When the parties present a factual dispute, the courts must provide them "a fair opportunity and a meaningful hearing to present their differing versions of those facts before a preliminary injunction may be granted." *Anderson v. Jackson*, 556 F.3d 351, 360 (5th Cir. 2009) (quoting

*Kaepa, Inc. v. Achilles Corp.*, 76 F.3d 624, 628 (5th Cir. 1996)). On the other hand, when "the party requesting the injunction cannot show that factual disputes exist regarding the required elements, and cannot introduce evidence sufficient to justify granting the motion, a hearing on the requested injunctive relief is unnecessary." *Id.* When "factual matters are not in dispute, no oral hearing is required and the parties need only be given 'ample opportunity to present their views of the legal issues involved.'" *Healthpoint, Ltd.*, 273 F. Supp. 2d at 777 (quoting *Kaepa, Inc.*, 76 F.3d at 628).

## III. ANALYSIS

Plaintiff argues that the City is violating his constitutional rights under the First, Fourth, and Fourteenth Amendments by enforcing the DSPP. Mot. at 2. But when he argues that he will succeed on the merits of his claims, he only addresses the following claims: (A) First Amendment Violation, (B) Prior Restraint; (C) First Amendment Retaliation; (D) Procedural Due Process; and (E) Substantive Due Process. *Id.* at 9-16. Because Plaintiff has the burden to establish each element required for obtaining a preliminary injunction, there is no need to address any potential success on any other asserted claim.

### A. <u>Historical Background for DSPP</u>

Before addressing the DSPP specifically, the Court first addresses the City's contention that, by publishing the DSPP in 2017, it modified how its vending ordinance (City Code § 16-236(b)(2)) would apply to street performers. In general, § 16-236 addresses "[a]reas prohibited to peddlers and canvassers." *See* ECF No. 11-2. Subsection (b) concerns the downtown business district and (b)(1) defines "Vend" as meaning, among other things, "accepting compensation in exchange for goods, merchandise, or services." *See id.* Furthermore, § 16-236(b)(2) makes it unlawful to "peddle, canvass, or solicit . . . any property or services or to hawk, sell, or vend goods,

merchandise, or services in the downtown business district on public property." *Id*. And § 16-236(b)(3) sets out various exceptions to the vending prohibition, including (c) as allowed by permit issued by the City. *Id*.

In reply, Plaintiff agrees that this ordinance prohibits peddling, canvassing, or soliciting of goods, merchandise, or services without a permit. Reply at 6. But he submits that, as a street performer, he is not a peddler, canvasser, or solicitor. *Id*. Relying on City Code § 16-226, he equates canvassing with soliciting and defines them as making "retail sales for future delivery of tangible property from house to house or any public place." *Id*.

But City Code § 16-226 defines "Canvasser" as "includ[ing] 'solicitor' and any person who makes retail sales for future delivery of tangible property from house to house or in any public place . . . ." *See* ECF No. 12-1. The provision does not limit "Canvasser" as interpreted by Plaintiff. City Code § 21-29, which governs aggressive solicitation, provides the following definition:

> *Solicit* means to request, by the spoken, written, or printed word, or by other means of communication an immediate donation or transfer of money or another thing of value from another person, regardless of the solicitor's purpose or intended use of the money or other thing of value, and regardless of whether consideration is offered.

*See* ECF No. 12-3. In pertinent part, this definition is consistent with the generic, dictionary meaning "[t]o try to obtain by . . . persuasion." *United States v. Mejia-Aguilar*, 575 F. App'x 233, 238 (5th Cir. 2014) (per curiam) (citing Webster's II New College Dictionary 1075 (3d ed. 2005)). Similarly, "solicitation" is defined in relevant part as an "act or an instance of requesting or seeking to obtain something." *See id.* (quoting Black's Law Dictionary 1520 (9th ed. 2009)).

Asking for money, even as a voluntary donation, is solicitation both as defined by City Code 21-29 and in the general meaning of the term. This falls within conduct made unlawful by § 16-236(b)(2) – "solicit . . . any property." In addition, § 16-236(b)(2) expressly makes it unlawful for any person to "vend . . . services" and the § 16-236(b)(1) definition of "Vend" includes

"accepting compensation in exchange for . . . services." It appears to be the City's position that accepting voluntary donations for a street performance is accepting compensation in exchange for a service. Although Plaintiff avers that his performances are for artistic expression and not for the purpose of selling services or obtaining donations, ECF No. 12-2 ¶ 2, there is no dispute that he accepts voluntary donations at his performances.

As the party seeking a preliminary injunction, Plaintiff has the burden to show he is entitled to the requested injunction. *See Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70 of Alameda Cnty.*, 415 U.S. 423, 443 (1974). Although the sought injunction directly relates to the DSPP, § 16-236(b)(2) appears relevant to provide context and to show that the DSPP expands Plaintiff's rights under the City's codes. Plaintiff has not shown that the City misinterprets § 16-236(b)(2) and his proffered alternative interpretation is unpersuasive.

Thus, as an initial matter, Plaintiff challenges the DSPP without regard to its historical emergence as relaxing the more restrictive requirements of § 16-236(b). By its terms, this ordinance would prohibit Plaintiff from soliciting and accepting donations for his performances absent a permit. The Fifth Circuit has upheld a prior version of this ordinance against a First Amendment challenge that it unconstitutionally restricted commercial speech, *see John v. City of San Antonio*, 336 F. App'x 411, 413 (5th Cir. 2009) (per curiam), and if Plaintiff successfully challenges the DSPP on constitutional grounds through this action then it would appear that he would be subject to the more stringent vending ordinance, which is not challenged in this action.

Here, the challenged policy – DSPP – provides an exception to § 16-236(b)(2) for street performers in the downtown business district. Plaintiff contends that the DSPP classifies his conduct as "noncommercial" and he cannot be categorized as a vendor simply because he accepts donations. The DSPP's introductory first paragraph does indeed encourage noncommercial artistic

10

expression. And the DSPP defines busking as performing for voluntary donations in designated areas. Based on that definition, a street performer's artistic expression in downtown San Antonio does not qualify as a street performance or busking unless conducted in a permitted area, i.e., an area not restricted by ¶ 4.1. Furthermore, despite the Policy's encouragement for noncommercial artistic expression, the City argues that Plaintiff's speech is commercial because he solicits and accepts donations from audience members.

At this point, the Court need not determine whether the speech constitutes commercial speech because it is merely considering the City's argument that the DSPP relaxes restrictions on street performers. Absent an exception from the general vendor ordinance for street performers through the DSPP, Plaintiff may be categorized as a vendor based upon his acceptance of donations. Through the DSPP, the City relaxes restrictions for downtown street performers while balancing its competing interests in (1) maintaining the Central Business District ("CBD") for public use for conversation, reflection, and community; (2) promoting tourism; (3) protecting the historic significance of certain downtown locations; (4) enhancing the character of urban life; (5) protecting downtown residents and hotel guests from unreasonable noise, audio clutter, and other public nuisances; (6) providing for the safe flow of pedestrian and vehicular traffic; and (7) maintaining the desired aesthetics and ambiance of the CBD. With this historical background and the balance of interests in mind, the Court proceeds to each claim upon which Plaintiff asserts that he has a likelihood of success.

**B. <u>First Amendment</u>**

Among other things, the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. The substantive limitations of the First Amendment apply to "the States and their political subdivisions" through the Fourteenth

Amendment. *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 301 (2000) (discussing Freedom of Religion clause). But it has long been "well understood that the right of free speech is not absolute at all times and under all circumstances." *Chaplinsky v. State of N.H.*, 315 U.S. 568, 571 (1942).

Because Plaintiff asserts both facial and as-applied challenges to the City Policy, the Court "must be careful to properly define their scope" as they "have different substantive requirements." *Catholic Leadership Coal. of Tex. v. Reisman*, 764 F.3d 409, 425 (5th Cir. 2014). A facial challenge is not limited to a particular plaintiff. *Doe v. Reed*, 561 U.S. 186, 194 (2010). An as-applied challenge includes challenges that do not seek to strike a provision "in all its applications." *See id.* Regardless of label, the important point is whether the claim and requested relief "reach beyond the particular circumstances of [the plaintiff]." *Id.* And if that is the case, then the challenge must satisfy the "standards for a facial challenge to the extent of that reach." *Reisman*, 764 F.3d at 426. Nevertheless, in general, courts ordinarily first address whether a challenged provision "would be valid as applied." *Serafine v. Branaman*, 810 F.3d 354, 363 (5th Cir. 2016). Moreover, for purposes of Plaintiff's motion for TRO or preliminary injunction, the Court finds no need to address any facial challenge because Plaintiff makes no effort to address his challenges as facial or as-applied and his arguments appear most suited to the as-applied analysis.

In general, the issue presented here is whether Plaintiff has a First Amendment right to street perform for voluntary donations that was violated by his exclusion from various public locations by the City. The City's recent update to the policy in question renders moot any issue as to whether the prohibition on amplification violated First Amendment rights.

Courts apply a three-step approach to determine whether a First Amendment right has been violated. *See Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985). First, protected speech must be at issue. *Id.* Next, they "identify the nature of the forum, because the

extent to which the Government may limit access depends on whether the forum is public or non-public." *Id*. And finally, they "assess whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Id*. The requisite standard depends on the level of judicial scrutiny that is required, which in turn affects the nature of permissible restrictions on free speech in a public forum. *See*, *e.g.*, *Perry Educ. Ass'n v. Perry Local Educators' Ass'n [hereinafter Perry]*, 460 U.S. 37, 45-46 (1983) (setting out standards for restricting speech in public forums); *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 561-64 (1980) (setting out standard for "commercial speech").

Only the third prong is at issue in this case. No one disputes that Plaintiff's expressive and artistic performances constitute protected speech. The Supreme Court has recognized that "live entertainment, such as musical and dramatic works fall within the First Amendment guarantee." *Schad v. Borough of Mount Ephraim*, 452 U.S. 61, 65 (1981). Plaintiff's chosen forum is public in nature. But even public forums present a spectrum of locations impacting the standard of review. *See Perry*, 460 U.S. at 45-46. In distinguishing between traditional public forums, designated public forums, and limited public forums, *Perry* sets out the following discussion as to the right of access and the standard by which courts evaluate limitations upon such a right:

> In places which by long tradition or by government fiat have been devoted to assembly and debate, the rights of the state to limit expressive activity are sharply circumscribed. At one end of the spectrum are streets and parks which "have immemorially been held in trust for the use of the public, and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." In these quintessential public forums, the government may not prohibit all communicative activity. For the state to enforce a content-based exclusion it must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end. The state may also enforce regulations of the time, place, and manner of expression which are content-neutral, are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication.
>
> A second category consists of public property which the state has opened for use by the public as a place for expressive activity. The Constitution forbids a

state to enforce certain exclusions from a forum generally open to the public even if it was not required to create the forum in the first place. Although a state is not required to indefinitely retain the open character of the facility, as long as it does so it is bound by the same standards as apply in a traditional public forum. Reasonable time, place and manner regulations are permissible, and a content-based prohibition must be narrowly drawn to effectuate a compelling state interest.

Public property which is not by tradition or designation a forum for public communication is governed by different standards. We have recognized that the "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view. As we have stated on several occasions, "the State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated."

*Id.* at 45-46 (citations and footnote omitted). Thus, the "Supreme Court has adopted a tripartite forum-based framework to analyze First Amendment issues involving governmentally owned property." *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 344 (5th Cir. 2001) (per curiam).

This case involves quintessential public forums and a policy that does not prohibit all communicative activity. Courts rigorously scrutinize efforts to exclude speakers from such forums. *See id.* But as set out in *Perry*, it is permissible to enforce content-neutral restrictions on the time, place, and manner of expression, so long as the restrictions "are narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication." *See id.* at 345 n.9.

And if the Court were to find Plaintiff's artistic expressions to constitute commercial speech, then it would subject the Policy to the even more deferential standard set out in *Central Hudson*. As that case recognizes, "commercial speech" is "expression related solely to the economic interests of the speaker and its audience." 447 U.S. at 561. Stated differently, "the test for identifying commercial speech" is whether the speaker seeks to "propose a commercial

14

transaction." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 473-74 (1989). Mere receipt of compensation for "services cannot be commercial speech." *Serafine*, 810 F.3d at 365.

In the context of commercial speech, "[t]he government may ban forms of communication more likely to deceive the public than to inform it or commercial speech related to illegal activity." *Central Hudson*, 447 U.S. at 563-64. Absent these misleading or legality concerns, "the government's power is more circumscribed" in that the restriction "must directly advance" a substantial government interest and "be designed carefully to achieve the [governmental] goal." *Id*. at 564. The careful-design component requires that the restriction reach "no further than necessary to accomplish the given objective." *RTM Media, L.L.C. v. City of Houston*, 584 F.3d 220, 224 (5th Cir. 2009) (quoting *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490 (1981)). Given the framework for evaluating commercial speech restrictions, such speech "enjoys lesser, intermediate-scrutiny constitutional protection." *Id*.

As noted earlier, the Fifth Circuit has upheld vendor ordinances of San Antonio. *See John v. City of San Antonio*, 336 F. App'x 411, 413 (5th Cir. 2009) (per curiam). Indeed, the Fifth Circuit found that the ordinances "easily survive the test articulated in *Central Hudson* . . . because they directly advance the City's interests in safety and aesthetics and are not more extensive than necessary." *Id*. Because commercial speech must propose a commercial transaction, the artistic expressions at issue in this case do not appear to qualify as commercial speech. But, in any event, to the extent the Policy in question restricts commercial speech, Plaintiff has not shown a substantial likelihood of success on his First Amendment claim.

The result is the same to the extent the City seeks to enforce a content-neutral restriction on the time, place, and manner of expression. The Supreme Court has made clear

> that even in a public forum the government may impose reasonable restrictions on the time, place, or manner of protected speech, provided the restrictions "are

> justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication of the information."

*Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (quoting *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).

Of course, "the crucial first step in the content-neutrality analysis" is determining whether the challenged speech restriction "is content neutral on its face." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 165 (2015). And because Plaintiff has the burden of persuasion to show a substantial likelihood of success, as well as all other elements for obtaining a TRO or preliminary injunction, the Court is limited to his arguments and those made in response.

Although in the motion itself, Plaintiff makes no specific argument for finding the Policy to be content based, he presents the argument with full force in the reply brief. *See* Reply at 2-5. He therein argues that the Policy at issue is content based because it "targets one class of speaker—street performers—or those 'presenting an artistic expression in the form of music, dance, acrobatic, comedy, singing, musical performance or other expressive activities.'" *Id.* at 3. While it seems that Plaintiff would stress the content-based issue in his motion rather than save it to reply to the City's arguments, the argument is presented directly against the City's position that the DSPP is content-neutral. The Court thus considers the argument but finds no merit to it.

In some instances, a speech restriction "draw[s] content-based distinctions on its face." *See McCullen v. Coakley*, 573 U.S. 464, 479 (2014). A restriction is content based when it requires "'enforcement authorities' to 'examine the content of the message that is conveyed to determine whether' a violation has occurred." *Id.* (quoting *FCC v. League of Women Voters*, 468 U.S. 364, 383 (1984)). A restriction is not content based when a violation merely depends on where the speech is uttered. *Id.* In some instances, furthermore, a speech restriction is content based when it

targets a "specific subject matter for differential treatment, even if it does not target viewpoints within that subject matter." *Reed*, 576 U.S. at 169.

Applying these legal principles on the facts and arguments of this case, the Court finds the artistic expressions of street performers are not content based. The mode of communication, i.e., music, dance, comedy, etc., does not reference the content of any artistic expression. Plaintiff challenges the Policy's restrictions on two grounds – location and amplification. The amplification challenge has been mooted by subsequent events. And Plaintiff's location challenge is not based upon the content of any artistic expression, but only the location where the expression occurs. Artistic expression is not a specific subject matter that makes the Policy content based.

As Plaintiff argues, the Policy is undoubtedly speaker based. But speaker-based distinctions neither "automatically render the distinction content neutral," nor automatically "demand strict scrutiny." *See id.* at 170. It is erroneous to presume "all speaker-partial" restrictions are invalid. *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 658 (1994). Instead, "speaker-based [restrictions] demand strict scrutiny when they reflect the Government's preference for the substance of what the favored speakers have to say (or aversion to what the disfavored speakers have to say)." *Id.* Restricting the Policy to street performers and their artistic expressions does not reflect any government preference to the content of their expressions. This case does not involve a speaker-based restriction that demands strict scrutiny and the Court finds that the Policy in question is not content based.

Having found the Policy content neutral on its face, the Court proceeds beyond facial neutrality. "The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward*, 491 U.S. at 791. A

"regulation of expressive activity is content neutral so long as it is justified without reference to the content of the regulated speech." *Id*. (citations, emphasis, and internal quotation marks omitted). The City justifies its Policy without regard to the content of the message conveyed.

As challenged, the content-neutral restriction is also narrowly tailored to serve a significant government interest and leaves open ample alternative channels of communication. Plaintiff argues that the Policy is not narrowly tailored because it "completely bans street performers from all public forums if there is any amplification." Mot. at 10. The City, however, has eliminated the amplification restriction from the Policy. Such restriction no longer affects whether the Policy is narrowly tailored or not. Plaintiff further complains that "the policy restricts street performers to some undefined areas of Houston Street and Travis Park while generally banning all locations downtown that serve any purpose that is otherwise open to the public." *Id*. at 10-11.

As the City explains, the Policy opens access to otherwise unavailable locations for street performers to express themselves. Without the Policy, the vendor ordinance would preclude the solicitation of voluntary donations. But even without that explanation, the Policy is a reasonable restriction on the location for street performers to engage in their artistic expressions. The geographic limitations are narrowly tailored to serve significant City interests. Narrowly-tailored does not mean the restriction is "'the least intrusive means' of achieving the desired end." *Ward*, 491 U.S. at 797. Instead, "the requirement of narrow tailoring is satisfied 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.'" *Id*. at 799 (quoting *United States v. Albertini*, 472 U.S. 675, 689 (1985)).

The City has identified several interests, including promoting tourism; protecting the historic significance of certain downtown locations; providing for the safe flow of pedestrian and vehicular traffic; and maintaining the desired aesthetics and ambiance of the CBD. The Court

agrees that "preserving the historical and aesthetic qualities" of a particular location is a significant and substantial governmental interest. *Knights of Columbus, Council No. 94 v. Town of Lexington*, 272 F.3d 25, 32 (1st Cir. 2001). Likewise, a city may have a "substantial economic interest by promoting tourism, and an interest in keeping its streets and neutral grounds open and available for movement in a manner that advances public safety." *City of New Orleans v. Clark*, 251 So. 3d 1047, 1054 (La. 2018); *accord Kagan v. City of New Orleans, La.*, 753 F.3d 560, 561 (5th Cir. 2014); *One World One Family Now v. City of Miami Beach*, 175 F.3d 1282, 1287 (11th Cir. 1999).

Excepting identified downtown locations of the historical City of San Antonio is a narrowly tailored way to promote substantial government interests that would be achieved less effectively without the challenged Policy. Furthermore, the DSPP identifies preferred areas for the artistic expressions of street performers and provides ample alternative locations for their performances in the downtown area. The DSPP opens and eases access for street performers to perform in downtown venues that would be restricted under the City's vendor ordinance. While some venues in the area remain restricted, like Alamo Plaza, they remain so for reasons of substantial and significant government interest. And locations close to those the DSPP excludes are available for the artistic expressions of street performers. For these reasons, the Court finds no substantial likelihood of success on Plaintiff's as-applied First Amendment claim and there is no need to address any facial challenge to the Policy.

## C. **Prior Restraint**

Although Plaintiff briefly invokes prior restraint in his motion, Defendant argues that he has presented nothing to support that anyone acting on behalf of the City has prevented him from performing. Resp. at 15 n.9. Instead, City personnel only approach Plaintiff during or after his performance if it appeared that he was violating an ordinance. *See id.* In reply, Plaintiff does not

revisit his claim of prior restraint.

"The term prior restraint is used to describe administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to oc-cur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (citation, emphasis, and internal quo-tation marks omitted). The Fifth Circuit has held "that if public officials abuse their discretionary power to deny in advance use of a forum for First Amendment-protected expression without en-acting proper safeguards, this constitutes an impermissible prior restraint." *Collins v. Ainsworth*, 382 F.3d 529, 539 (5th Cir. 2004).

Based on the brief argument in Plaintiff's motion, the Court does not find that he has carried his burden to show a substantial likelihood of success on his prior-restraint claim. He has not shown any abuse of discretionary power by any public official. And to the extent a prior restraint requires a content-based restraint, *see United States v. Quattrone*, 402 F.3d 304, 309 (2d Cir. 2005) (stating that a "'prior restraint' on speech is a law, regulation or judicial order that suppresses speech—or provides for its suppression at the discretion of government officials—on the basis of the speech's content and in advance of its actual expression"), the Policy challenged by Plaintiff is content-neutral as discussed in the prior section.

**D. <u>First Amendment Retaliation</u>**

Plaintiff asserts a claim of retaliation under the First Amendment. But he bases this claim on the facts that (1) he was engaged in street performance with amplified music and (2) he was either expelled from the area or unlawfully detained. Mot. at 12-13. However, in the context of a retaliatory arrest, "plaintiffs must plead and prove the absence of probable cause" in order "[t]o prevail on a First Amendment retaliation claim." *Roy v. City of Monroe*, 950 F.3d 245, 255 (5th Cir. 2020). While Plaintiff premises his claim on expulsion and unlawful detention, a similar

showing seems necessary for such claim and Plaintiff has failed to make any similar showing. Whether or not such similar showing is necessary, Plaintiff has not carried his burden to show a substantial likelihood of success on this claim when his conceded facts show that he was using amplified music in violation of the City Policy as it existed at that time.

### E. Procedural Due Process

Plaintiff also claims that the DSPP violates his procedural due process rights because he is expelled or detained for violating the Policy. Mot. at 13-15. But as the City points out, the DSPP has no independent enforcement provision. Resp. 14-15. It instead provides that other ordinances will not be enforced so long as street performers, like Plaintiff, are within the DSPP guidelines. *See id.* And if he receives a citation for some other violation, he has received meaningful and timely notice of the charge against him and may avail himself of all process provided in the municipal courts. Plaintiff has not shown a substantial likelihood of success on his procedural due process claim.

### F. Substantive Due Process

Although Plaintiff asserts a substantive due process violation claim, such a claim is redundant of his First Amendment or procedural due process claim. *See* Mot. at 15-16. When a claim is governed by a specific constitutional provision, the courts analyze such a claim "under the standard appropriate to that specific provision and not under the rubric of substantive due process." *Calhoun v. Hargrove*, 312 F.3d 730, 735 (5th Cir. 2002) (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Plaintiff has not shown a substantial likelihood of success on this claim.

### G. Summary

Plaintiff has not carried his burden to show a substantial likelihood of success on any claim. The Court thoroughly addressed his primary claim asserted under the First Amendment. And for

that claim, the City has carried its burden to justify the Policy. *See Byrum v. Landreth*, 566 F.3d 442, 446 (5th Cir. 2009). Furthermore, there is not a sufficient likelihood that the City "will ultimately fail to prove its [Policy] constitutional." *See id.* In the First Amendment context, when the Plaintiff "cannot demonstrate a substantial likelihood of success on the merits in his constitutional challenge," the Court properly denies the Plaintiff's request for a preliminary injunction. *Moore v. Brown*, 868 F.3d 398, 406 (5th Cir. 2017).

Due to the nature of Plaintiff's other claims, the brevity of the arguments made in support, and the Court's preference to issue a ruling on Plaintiff's motion as soon as time permitted, the Court has addressed Plaintiff's other claims more summarily. But as already noted, Plaintiff has not shown a substantial likelihood of success on any of them either. Furthermore, his claims of irreparable injury relate to alleged deprivation of constitutional rights that he has not shown a substantial likelihood of success. *See* Mot. at 16. He characterizes the balance of harms as his First Amendment right versus the City banning street performers from a public forum. *Id.* at 17-18. And similarly, as to the final element for obtaining a TRO or preliminary injunction – disservice of public interest – Plaintiff again rests his case on alleged infringement of constitutional rights that he failed to show a substantial likelihood of success. *Id.* at 18. He states that "[i]t cannot be a disservice to the public to have this Court enter an order allowing [him] and other street performers to access outdoor public spaces owned by the City in a manner consistent with any ordinary member of the public." *Id.* The City, however, has stated significant and substantial government interests that justify the location restriction imposed on street performers in identified areas of downtown San Antonio. Based on the arguments presented by Plaintiff, he has not carried his burden on any element for obtaining a TRO or preliminary injunction. Accordingly, the Court finds no basis to grant Plaintiff's motion.

## IV. CONCLUSION

For the foregoing reasons, the Court **DENIES** *Plaintiff's Emergency Motion for a Temporary Restraining Order and Preliminary Injunction* (ECF No. 7).

**SIGNED this 5th day of February 2021.**

**JASON PULLIAM**
**UNITED STATES DISTRICT JUDGE**